Veronica ARGUETA, as the legal representative of her minor son, Joshua Argueta, Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 07–784 V.

United States Court of Federal Claims.

Filed under seal: Dec. 22, 2011.

Re-issued for Publication: Jan. 9, 2012.

Veronica Argueta, Petitioner, Pro Se.

Darryl R. Wishard, Trial Attorney, Gabrielle M. Fielding, Assistant Director, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

### OPINION ON MOTION FOR REVIEW [1]

DAMICH, Judge:

On August 1, 2011, Petitioner Veronica Argueta, mother and legal representative of her minor son, Joshua Argueta, filed a petition for review of the Special Master's Decision on Entitlement ("Special Master Dec." or "Dec."), 2011 WL 2945803, No. 07–784 V, June 30, 2011, denying compensation under the National Child Vaccine Injury Act of 1986, 42 U.S.C. § 300aa–1 *et seq.* (2006) ("Vaccine Act"). Ms. Argueta had alleged that a diphtheria-tetanus-acellular pertussis ("DTaP") vaccination that Joshua had received on November 10, 2004, caused him to develop an encephalopathy and seizures and to suffer permanent brain injury. Petition ("Pet.") at 1–4.

In particular, Petitioner alleged that Joshua's injury was an encephalopathy under the Vaccine Injury Table, 42 C.F.R. § 100.3 (2010). The Special Master ruled, however, that Petitioner had not met her burden of proof of two factual elements required of a Table encephalopathy. First, she had not shown that Joshua exhibited the requisite conditions of an acute encephalopathy within a prescribed time period and, second, Joshua had in fact exhibited symptoms of his injury prior to his vaccination. A failure of proof in either respect precludes recovery for a Table injury under the Vaccine Act.

As grounds for her motion for review, Petitioner faults the Special Master's findings of fact as inconsistent, contrary to evidence and logic, and lacking a rational basis.

For the reasons set forth below, the Court DENIES Petitioner's motion for review.

### I. Table Encephalopathy

Under the Vaccine Act, a petitioner alleging a Table injury need not demonstrate causation in fact. The Table "lists the vaccines covered under the Act, together with particular injuries or conditions associated with each one." *Shalala v. Whitecotton*, 514 U.S. 268, 270, 115 S.Ct. 1477, 1479, 131 L.Ed.2d 374 (1995). If the claimant can show that she (or the injured person for whom she acts) suffered an injury listed on the Table associated with a vaccine and that the first symptom or manifestation of the onset or aggravation of the injury occurred within a time period prescribed under the Table, then causation is presumed. *Id.* "Thus, the rule of prima facie proof turns the

---

1. In accordance with Rule 18(b) of the Vaccine Rules of the United States Court of Federal Claims ("VRCFC"), this opinion was first filed under seal and then "held for 14 days to afford each party an opportunity to object to the public disclosure of any information furnished by that party." The parties proposed no redactions and the opinion is hereby re-issued for publication only with adjustment to the footnotes.

old maxim on its head by providing that if the *post hoc* event happens fast, *ergo propter hoc.*" *Id.*

A vaccine recipient has suffered a Table encephalopathy if he manifests, within the applicable period, "an injury meeting the description ... of an acute encephalopathy, and then a chronic encephalopathy persists in such person for more than 6 months beyond the date of vaccination." 42 C.F.R. § 100.3(b)(2). An acute encephalopathy is further characterized as "one that is sufficiently severe so as to require hospitalization (whether or not hospitalization occurred)." § 100.3(b)(2)(i).

An acute encephalopathy in children less than 18 months of age who present without an associated seizure is indicated by "a significantly decreased level of consciousness lasting for at least 24 hours." § 100.3(b)(2)(i)(A). A "significantly decreased level of consciousness" in turn is indicated by at least one of three clinical signs for at least 24 hours: "Decreased or absent response to environment (responds, if at all, only to loud voice or painful stimuli);" "Decreased or absent eye contact (does not fix gaze upon family members or other individuals);" or "Inconsistent or absent responses to external stimuli (does not recognize familiar people or things)." § 100.3(b)(2)(i)(D).

Conditions such as "[s]leepiness, irritability (fussiness), high-pitched and unusual screaming, persistent inconsolable crying, and bulging fontanelle," however, do not suffice as demonstrating an acute encephalopathy or a significant change in level of consciousness. § 100.3(b)(2)(i)(E).

The applicable time period for manifestation of an acute encephalopathy due to the DTaP is 72 hours vaccine after administration. § 100.3(a)II.B.

█ A petitioner has an additional burden of proof, moreover, of a Table injury under the Vaccine Act. "[A] demonstration that the claimant experienced symptoms of an injury during the table period, while necessary, is insufficient to make out a prima facie case. The claimant must also show that no evidence of the injury appeared before the vac-

cination." *Whitecotton,* 514 U.S. at 274, 115 S.Ct. 1477.

## II. Standard of Review

█ Under the Vaccine Act, a court may set aside a Special Master's findings of fact or conclusions of law only if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B). "We owe no deference to the Claims Court or the special master on questions of law. We uphold the special master's findings of fact unless they are arbitrary or capricious." *Porter v. Sec'y of HHS,* 663 F.3d 1242, 1249 (Fed.Cir.2011) (citing *Andreu v. Sec'y of HHS,* 569 F.3d 1367, 1373 (Fed.Cir.2009)).

█ In that regard, "the fact-finder has broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley v. Sec'y of HHS,* 991 F.2d 1570, 1575 (Fed.Cir.1993). "Indeed, this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act." *Porter,* 663 F.3d at 1250. Moreover, "[s]uch credibility determinations are 'virtually unreviewable' " on appeal. *Id.*

In *Porter,* the Federal Circuit twice recited the limited role of the reviewing court with respect to the Special Master's findings of fact:

> We do not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder.

*Id.* at 1249, 1254.

█ The charge of this court, accordingly, is not to put itself in the place of the fact finder, but rather to examine the foundation of the Special Master's decision. In *Porter,* the Federal Circuit found that the Special Master's decision "reveals a thorough and careful evaluation of all of the evidence including records, tests, reports, and medical literature, as well as the experts' opinions and their credibility." *Id.* at 1254.

■ "As we have previously indicated, 're-versible error' will be extremely difficult to demonstrate' where the special master 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" *Id.* (quoting *Hines v. Sec'y of HHS,* 940 F.2d 1518, 1528 (Fed.Cir.1991)).

### III. Background

Joshua Argueta was born on May 8, 2004, at thirty-six weeks gestation. He weighed six pounds, nine ounces.[2] Pet'r Ex. 3 at 1, 3.

Through the summer and early fall of that year, he was taken to Dr. Stephen Shlafer, a pediatrician, for such complaints as vomiting and dacryocystiitis (inflammation of the lacrimal sac), Pet'r Ex. 5A at 1–2, excessive crying and possible hernia (protruding belly button), *id.* at 4, excessive spitting up and possible acid reflux, *id.* at 5, crying and high fever, *id.* at 7, and diffuse rash, *id.* at 8.

On October 25, 2004, Joshua was taken to the Providence Everett Medical Center ("Providence") emergency room because Petitioner noticed "something odd" about Joshua's pupils, that his left eye's pupil was irregular and "has never been right." Pet'r Ex. 1 at ¶ 8; Pet'r Ex. 4B at 8; Tr. at 71, 91.[3] The medical record from that visit indicates that Joshua's irregular pupil shape was thought to be congenital and that Petitioner was advised to see an ophthalmologist. Pet'r Ex. 4B at 11–12. Petitioner said the emergency room personnel described Joshua's pupil's condition as "colobamas."[4] Tr. at 48. Petitioner took Joshua to Dr. Shlafer the next day, Pet'r Ex. 5A at 9, Tr. at 48–49. She testified that Dr. Shlafer told her that Joshua had no retinal response. *Id.* It was explained to Petitioner that the lack of retinal response typically meant that the child would be blind. *Id.* Petitioner sought a second opinion from a

nurse practitioner, Gregory A. Lind ("NP Lind"), to whom she had taken her older children in prior years. *Id.* at 49–51.

On November 5, 2004, Joshua was seen by NP Lind, who confirmed that Joshua had a coloboma, *id.* at 52, referred Petitioner to an ophthalmologist at Seattle's Children's Hospital, Tr. at 53, and recommended that Joshua proceed with his vaccinations. *Id.* NP Lind also noted that Joshua's "teardrop pupils" may be "benign congenital" and found "no red reflex." Pet'r Ex. 7 at 3. On November 10, 2004, Joshua returned to NP Lind for his six-month "well child exam" and received several vaccinations, including his first DTaP vaccine. NP Lind's notes of the November 10 visit again noted Joshua's coloboma and that Joshua had an appointment to see an ophthalmologist the next day.

On the night of Joshua's DTaP vaccination, according to Petitioner, he started crying at a church event and had to be taken home. He cried for a few hours into the night and wouldn't eat anything. Tr. at 54–55. Petitioner's fact witness, Eileen Stobbe, with whom Petitioner and her family lived from July to December 2004, similarly testified that Joshua was "very fussy" that evening and had cried "inconsolably." *Id.* at 25–26. She said he "just was not a happy baby." *Id.* Ms. Stobbe further explained, however, that "other than being fussy" the first night after his vaccination, he showed a change in his interaction with her but it was gradual over the next two weeks after the vaccination. Tr. at 27–28, 36, 39.

Petitioner testified that the next morning, November 11, 2004, Joshua was "lethargic and limp," "just kind of laying there," "kind of blah." *Id.* at 56. She said he ate a little bit, but was "just not responding and not happy and not himself, not playing." *Id.* at

---

**2.** Petitioner acknowledges and the medical records make note of Petitioner's use of crack cocaine, alcohol, pain pills, and tobacco during the early months of her pregnancy with Joshua. Pet'r Ex. 1 at ¶ 1; Pet'r Ex. 2 at 21; Pet'r Ex. 5B at 5; Pet. Ex. 7 at 4; Tr. At 70. She avers without contradiction that she ceased using such substances once she learned of the pregnancy.

**3.** The Special Master conducted a hearing on Petitioner's claim on August 3 and 4, 2010, in

Seattle, Washington. Citations to the transcript pages are noted as "Tr. at ——".

**4.** The Special Master's decision defined a coloboma as "an absence or defect of the ocular tissue, usually due to malclosure of the fetal intraocular fissure, or sometimes from trauma or disease," citing *Dorland's Illustrated Medical Dictionary.* Dec. at *3 n. 9.

57. She said he did not make eye contact with her, "didn't seem to know anything," and was like that all day. *Id.* She said he was like that "probably for about a week," that he didn't make eye contact with her until the end of December, and that he started having what she later understood were seizures "between one or two weeks" after the November 10 vaccinations. *Id.* at 57–59.

In an affidavit attached to her Complaint, Petitioner stated that, the evening of his vaccination, "I remember thinking that he had worn himself out, because after the crying stopped he was very lethargic. He didn't want to suck on his bottle or breast feed that night. He would not smile or coo or try to sit up. He would not focus on me or anything." Pet'r Ex. 1 at ¶ 14. Eileen Stobbe testified that, the next day after Joshua's vaccination, he was irritable, no longer wanted to pull himself up, and didn't seem to have the energy he had had before. Tr. at 27. She said that she observed "episodes of stiffening" within the "next two weeks" after vaccination. *Id.* at 28. Ms. Stobbe's husband, Leonard, testified that he noticed a change in Joshua "a day or two" after his vaccination. *Id.* at 21. "Suddenly he no longer appeared that he could see me and no longer appeared that he could hear me. It was just like somebody had turned a switch and the lights went out. He just wasn't there anymore." *Id.* at 13. He said it was a sudden, "very noticeable" change. *Id.* In a written statement, Mr. Stobbe said that, after Joshua's vaccination, "we were concerned that not only might he be blind but also deaf." Pet'r Ex. 14.

On November 11, 2004, the day after his DTaP vaccination, Joshua attended the previously scheduled appointment with Dr. Avery H. Weiss, a pediatric ophthalmologist at Seattle Children's Hospital ("Children's Hospital"), to whom he was referred by NP Lind. Tr. at 59. On Dr. Weiss's "Patient History and Intake Form," under the section entitled "Current Health Concerns," Petitioner answered the question, "Why are we seeing your child today?," with the answer, "irregular pupils and vision." Pet'r Ex. 6A at 16. She did not write in any answer to the question, "What other concerns or questions do you have about your child's general health." *Id.* On a yes/no check-off list of various symptoms and their duration, she checked "yes" only to "Snoring" (duration: "?"), "Ear/Throat Pain" (no duration indicated), "Runny Nose" ("1 week"), "Trouble Seeing" (duration: "? ?"), "Wheeze" ("1 week"), Cough ("1 week"), and "Diarrhea" ("3 days"). *Id.* In particular, she answered "no" to "Weakness/Tired," "Trouble Hearing," and "Poor Eating/Drinking." *Id.*

Dr. Weiss's "outpatient note" from the November 11, 2004, visit recites that Joshua was seen "on a semiemergent basis for abnormal-appearing pupils and abnormal papillary light reflex." Pet'r Ex. 6A at 12. Dr. Weiss wrote, "The mother first noticed the abnormal shape of the pupils about three weeks ago. She feels that he can see but at other times he just does not pay attention to what is going on around him." *Id.* Under "History," Dr. Weiss also noted that Joshua had had a well-child exam the previous day "that was completely normal." *Id.*

Under the part of his outpatient note on "Physical Examination," Dr. Weiss reported, "This child intermittently seems to be alert, attentive and fixates on objects. At other times he ignores his visual environment." *Id.* He further noted, "Generates purposeful conjugate eye movements at times but visual attention is short. Both pupils are irregularly shaped with a very subtle partial coloboma on the right and more complete inferior iris coloboma on the left." *Id.* He described Joshua as "an alert, normal-appearing child with no dysmorphic facial features." *Id.*

In the note, Dr. Weiss recorded two impressions:

1. Bilateral iris coloboma. This child has bilateral iris coloboma without clear retinal involvement. Iris colobomas can have the same systemic implications as chorioretinal colobomatous malformations but there is no family history of coloboma that we know of. The mother does not know his dad as she was out of it while she was actively drug addicted. There are no obvious dysmorphic features to suggest an underlying genetic disease. . . .

2. Subnormal visual orienting behavior. This child's visual orienting behavior is not age appropriate. Either he has visual inattention or delayed visual maturation in the context of cortical visual impairment.... If his acuity is normal then he has visual inattention or possibly subtle cortical visual impairment with delayed visual maturation.... It is very possible that with his prenatal history of exposure to drugs there may be some mild cortical visual impairment and delayed visual maturation.

*Id.* at 13.

Petitioner testified that, while Joshua was lethargic for at least a few days after the vaccination, she did not take Joshua to any other doctor other than to the previously scheduled appointment with Dr. Weiss because she thought he was just having a "reaction," but "would get better." Tr. at 90. She also testified that she didn't think she had mentioned Joshua's crying the night before to Dr. Weiss, but that "I remember talking to him a little about him not being responsive." *Id.* at 78. Ms. Stobbe testified as well that she did not have any concern that Joshua needed to go to an emergency room in the three days following his vaccination. Tr. at 31.

Joshua's next occasion for medical treatment was on November 26, 2004, about two weeks after his vaccinations. Petitioner took him to NP Lind because "Josh wasn't getting better, and then he was developing kind of a croupy cough also." Tr. at 60. She said Josh was still lethargic and not responding. *Id.* at 61. She testified that "Dr. Greg [NP Lind] waved his hand in front of Josh's face very close and Josh didn't blink and he told me that Josh was blind." *Id.* at 61. NP Lind's notes of that visit reflect that Joshua had no red reflex, abnormal eye movement, and was blind "close up." Pet. Ex. 7 at 6, 7.

On November 30, 2004, Joshua was again seen by NP Lind and treated for bronchitis and a right ear infection. Pet'r Ex. 7 at 8. On December 9, 2004, Joshua was treated in Dr. Shlafer's office for croup. Pet'r Ex. 5A at 11–12. At that appointment, Petitioner tried to get a nurse to observe one of Josh-

ua's "episodes" (i.e., seizures) while he was in the waiting room, but was unsuccessful. Tr. at 62, 83; Pet'r Ex. 1 at ¶ 26. Joshua was prescribed a medication for his breathing problem. Pet'r Ex. 5A at 12. On December 13, 2004, Petitioner took Joshua to the emergency room at Providence because of three-to-four days' symptoms of cough, congestion, and trouble breathing. Pet. Ex. 4C at 16. The treatment administered was racemic epinephrine, nebulizer, and Decadron. *Id.* at 18.

On December 15, 2004, a test was performed of Joshua's "visual evoked potentials" ("VEP"s) at Children's Hospital. Dr. Weiss and Dr. John Kelley of the Clinical Vision Center there interpreted the results as indicating "near normal to mildly abnormal visual function despite no overt visual tracking," but "consistent with an impairment of higher visual-cortical function, either due to immaturities in attention or sensory-motor integration." Pet'r Ex. 5B at 3, Ex. 6A at 21. There was "no evidence of chorioretinal coloboma." *Id.*

The next day, December 16, 2004, Joshua was taken to the Providence emergency room for "cough" and was admitted for observation. Pet'r Ex. 4D at 31. The hospital report indicates he presented with "a 10–day history of cough and stridor." *Id.* "Patient Progress Notes" recite, "10–14 days of periodic tonic posturing, lasting up to ten minutes at a time—mom wonders if possibly seizures." *Id.* at 33. They also note a heart murmur, "floppy, poor tone," and "possible abnormal spastic movements in face of poor neuro-development." *Id.* at 34. The notes reflect that Petitioner was "not happy" with Joshua's primary care doctor, Dr. Shlafer, *id.*, and that "Per mom, she has been concerned re baby's growth + dev × several months but was not listened to by PCP (= Shlafer)." *Id.* at 36. After noting Petitioner's prenatal drug use, the notes recite that Petitioner was "*very* concerned about impact her past activities had on baby." *Id.* A nurse indicated some seizure activity. *Id.* at 55. An EEG that Joshua underwent on December 18, 2004, was interpreted as abnormal, "compatible with hypsarrhythmia and, consequently, West syndrome." *Id.* at 42; *see*

Special Master Decision at *7 n. 19 (defining West syndrome as "another term for infantile spasms").

A note regarding Joshua from the Snohomish County Community Health Center on December 20, 2004, stated, "3 weeks ago, mother noted tensing of both arms and throwing head back—uprolling of eyes." Pet'r Ex. 8 at 1.

Joshua was referred for occupational therapy evaluation on December 21, 2004, at Providence. Pet'r Ex. 4E at 97. The evaluation report noted, "Veronica stated that the seizure-like activity started 2 weeks ago, the same time as the croup. She said that his skills in all areas declined at that time." *Id.* The report's impressions included, "Joshua is significantly delayed in his motor skills. Per parent report Joshua's verbal and motor skills have significantly declined since his most recent illness and seizure-like behavior.... He demonstrates cortical thumbing >75% of the time...." *Id.* at 98.

On December 29, 2004, Joshua was admitted to Children's Hospital with a complaint of infantile spasms. Pet'r Ex. 5B at 5. The history portion of the report on that date, by the attending neurologist, Dr. Anthony Bouldin, recites that Joshua was referred to Children's

for evaluation of episodic events which have been going on since early to mid November. These are described as clusters of events of brief activity described as the head going back, eyes blinking, making a grunting sound, throwing arms forward and crunching forward of the trunk. Each event lasts two to three seconds.

*Id.*

Among other tests during his admission, Joshua was evaluated by geneticist, Anne V. Hing, M.D. *Id.* at 8. According to her report, dated December 31, 2004,

Joshua's mother states that she first noted episodes in November when Joshua would blink his eyes, throw his arms forward, and flex forward at the trunk with extension at the neck. Each episode was brief, lasting several seconds, but he would have clus-

ters of the events that lasted between 10 to 40 minutes each, up to 5 times per day. *Id.*

Dr. Hing also noted that Petitioner had stated that "prior to the onset of the infantile spasms, [Joshua] did roll over on one occasion, and then after the onset of the spasms, he has not tried to roll over." *Id.* Dr. Hing noted, however, "I am unable to identify a unifying syndromic diagnosis to explain both the eye findings and the infantile spasms." *Id.* at 9. When Joshua was discharged from Children's on January 1, 2005, the discharge report noted a principal diagnosis of infantile spasms and secondary diagnoses of gastroesophageal reflux disease, bilateral colobomas with subnormal visual orienting behavior, and developmental delay. *Id.* at 11. It also stated, "[T]he patient has had loss of motor skills since 4 months of age." *Id.*

By the time of the hearing in the instant case before the Special Master, Petitioner testified that Joshua was severely developmentally delayed, Tr. at 68, had not begun walking until age four, had difficulty with balance, could not talk, and wore diapers. Tr. at 68–69. He was, however, able to make eye contact, visually follow, and watch television and videos. Tr. at 69. He was no longer on seizure medications and had been seizure-free since 2005. Tr. at 69–70.

IV. Discussion

The task of this court on review is to weigh whether the Special Master properly considered the relevant evidence in the record before her, came to factual conclusions based on plausible inferences, and provided a reasoned explanation for her conclusions and her decision. *Hines,* 940 F.2d at 1528.

Here, two factual findings of the Special Master underlie her decision that Petitioner failed to demonstrate a Table encephalopathy. First, she determined that Petitioner failed to prove that Joshua exhibited the symptoms of acute encephalopathy within the first 72 hours after his DTaP vaccination. Second, she found that Petitioner failed to show that there was no evidence of symptoms of his injury prior to his vaccination. Because "the petitioner carries the burden of proof with respect to each of the require-

ments necessary to make out a prima facie Table injury," Dec. at *13, she ruled therefore that Joshua did not meet the requirements under the Vaccine Act of entitlement to compensation.

## A. Acute Encephalopathy within 72 Hours

 The Special Master noted that, "[t]o constitute an 'acute encephalopathy,' the vaccinee's condition must be sufficiently severe to require hospitalization, whether or not hospitalization occurs." *Id.* She then reviewed the evidence to inquire whether Joshua had exhibited a "significantly decreased level of consciousness" within the requisite time period. *Id.* First, in support of her factual finding, she observed that "[n]o treating physician ever recorded an opinion that Joshua had suffered an acute brain injury at the time of his vaccination on November 10, 2004, or in the 72 hours following." *Id.* at *14. She then examined Petitioner's statements and conduct in that critical period and that of Dr. Weiss and compared the testimony of both Petitioner's and Respondent's experts.

The Special Master contrasted the testimony of Ms. Argueta, in August 2010, of a dramatic change in Joshua's condition the day after his vaccination with the written information she provided, as well as her conduct, on the occasion of Joshua's appointment with Dr. Weiss on November 11, 2004. For example, the Special Master noted that: 1) Petitioner merely took Joshua in for a preexisting eye examination, rather than for any stated concern that he had developed a sudden unresponsiveness; 2) did not specify the symptoms of acute encephalopathy, such as lethargy, complete unresponsiveness, and failure to recognize familiar people, on the intake form; 3) did not report those symptoms to Dr. Weiss; and 4) did not report to Dr. Weiss that Joshua's "trouble seeing" had gotten significantly worse since the day before. The Special Master found it "inexplicable" that Petitioner had not referenced any "sudden and dramatic decrease in Joshua's

responsiveness" on the intake form. *Id.* at *15. The Special Master reasoned, "Petitioner's actions as well as her words on November 11, 2004, undermine the allegation that Joshua's condition on that date was sufficiently acute to require hospitalization, as necessary to establish a Table encephalopathy." *Id.* "I cannot reconcile Petitioner's description of Joshua on November 11, 2004, with her having taken no action to obtain treatment for him while she was at Seattle Children's Hospital." *Id.*[5]

The Special Master also noted that Dr. Weiss's notes of the November 11, 2004, appointment showed no indication that Joshua was exhibiting symptoms of an acute encephalopathy suggesting the need for hospitalization. To the contrary, the Special Master found Dr. Weiss's notes "inconsistent with such a condition." *Id.* at *16. To Dr. Weiss, Joshua presented as "an alert, normal-appearing child." Pet'r Ex. 6A at 12. The Special Master interpreted Dr. Weiss's clinical impression, "subnormal visual orienting behavior . . . not age appropriate," *id.*, as a "developmental rather than an acute disorder." Dec. at *16. She also noted Dr. Weiss's observation regarding Petitioner's prenatal substance abuse. She concluded, "Unless Dr. Weiss, a pediatric ophthalmologist at a teaching hospital in a major American city, simply missed an acute encephalopathic process occurring 'right before his eyes,' the record of his examination (which includes descriptors such as 'alert,' 'attentive,' and 'normal-appearing') refutes the Petitioner's allegation of a Table injury." *Id.*

Petitioner's expert, Dr. Schweller, speculated that Dr. Weiss had missed Joshua's acute encephalopathy because the latter had perhaps been focusing more on Joshua's visual problems and had not recognized that there was an acute diminished responsiveness. Tr. at 117–18. The Special Master considered Dr. Schweller's testimony but found it unpersuasive. Dec. at *17. First, she observed that Dr. Schweller's conclusion that Joshua had undergone an acute change

---

5. The Special Master also noted "significant inconsistencies in [Petitioner's] recollection of the events in the days following Joshua's vaccinations" and thus found her testimony unreliable "concerning the timing of Joshua's post-vaccine reaction and the onset of his infantile spasms." Dec. at *4 n. 11.

was based on Petitioner's testimony, which the Special Master had found unreliable. She also found that Dr. Schweller's conclusion "conflicted with the records created contemporaneously by Dr. Weiss." *Id.* Instead, the Special Master credited the testimony of Dr. Mary Anne Guggenheim, Respondent's expert in pediatric neurology, who associated Joshua's infantile spasms with the diminished interactivity in the patient history later reported by Dr. Bouldin. Dr. Guggenheim opined that, based on her review of the medical records, even prior to Joshua's vaccination, "there was something different about how he paid attention to visual stimuli." Tr. at 186. In short, Dr. Guggenheim found no evidence of an acute encephalopathy but rather preexisting brain abnormalities "manifested by delayed development prior and the coloboma, which are a marker in the eye from something abnormally developmentally in the visual system of the brain." *Id.* at 212. "So when I put all that data together that's why I conclude that this child's problems as now exist and his infantile spasm, very serious neurologic problem of infancy, were not related to the immunizations he received." *Id.* at 210–11.

▇ That the Special Master credited the testimony of Dr. Guggenheim over that of Dr. Schweller was within her discretion and was fully buttressed by reference to the medical records. "Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence." *Moberly v. Sec'y of Health and Human Services,* 592 F.3d 1315, 1326 (Fed.Cir.2010).

### B. Evidence of Injury Prior to Vaccination

▇ The Special Master found that "the medical records from the months immediately before and after his vaccination indicated that the first manifestation of Joshua's visual attention problems occurred before vaccination." Dec. at *18. In the medical records, she noted first that the diagnosis of Joshua's colobomas preceded his vaccination. She remarked on Petitioner's comment in the record of the October 25, 2004, visit to Provi-

dence that Joshua's left eye had "never been right." Pet'r Ex. 4B at 8, 11. The treating physician on that occasion wrote that the colobomas were "probably congenital." *Id.* at 11. She further noted that Dr. Weiss had associated Joshua's colobomas with "visual-cortical dysfunction." Dec. at *18. The Special Master construed Dr. Weiss's notes as indicating "that the colobomas were associated with an apparent visual attention deficit noted by Petitioner weeks earlier, not with an acute process occurring overnight on November 10, 2004." *Id.* Instead of being merely cosmetic vision problems, Joshua's tendency at times not to pay attention to his surroundings was seen by Dr. Weiss and Dr. Guggenheim as evidence of a possible developmental disorder due to prenatal factors.

▇ Significantly, the Special Master credited the medical record of Joshua's treatment at Providence on December 16, which indicated that Petitioner's concern for Joshua's growth and development had begun "several months" prior, as critical evidence of a pre-vaccination injury. In this respect, once again, the Special Master was within her discretion to credit the contemporaneous, documented account of this time-line rather than Petitioner's contrary testimony given at the hearing in 2010. "Medical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health and Human Servs.,* 993 F.2d 1525, 1528 (1993) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1947)).

In addition, the Special Master cited the discharge summary from Joshua's hospitalization in late December 2004, which noted that Joshua "had had a loss of motor skills since 4 months of age." Pet'r Ex. 5B at 11. Petitioner argues that the medical record here (as elsewhere) was inexact, that what was meant was Joshua's diminished motor skills since his 4–*month* vaccination. Nevertheless, the Special Master was within the bounds of her discretion, as she, as factfinder, was in the "unique position to see the witnesses and hear their testimony." *Doe v. Sec'y of HHS,* 601 F.3d 1349, 1355 (Fed.Cir. 2010).

**282**

The court finds that the Special Master clearly reviewed the record as a whole and, based on the evidence in the record, her conclusion—that Joshua "displayed symptoms of visual inattentiveness and delayed development for several weeks if not several months before his vaccination," Dec. at *19— is well-grounded and rational.

### V. Conclusion

It is clear to the court that the Special Master " 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.' " *Porter,* 663 F.3d at 1253–54. Petitioner's Motion for Review is denied and the Clerk is directed to enter judgment accordingly.